**[Cite as *In re S.B.*, 2026-Ohio-1201.]**

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE S.B.                                     :

                                             No. 115670

A Minor Child                                  :

[Appeal by M.B., Father]                       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 2, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. FA25100633

---

### *Appearances:*

M.B., *pro se.*

---

KATHLEEN ANN KEOUGH, J.:

{¶ 1} M.B. ("Father"), appearing pro se, appeals the trial court's disposition of his applications to determine shared parenting and custody of his daughter, S.B. The child's mother, I.M. ("Mother"), did not file a responsive brief or appear in this matter but did appear for oral argument. After a thorough review of the record and law, we affirm.

{¶ 2} On January 21, 2025, Father commenced this action when he filed an application to determine shared parenting of S.B., a minor child, between Mother

and himself. Father filed an application to determine custody in May 2025 and a motion to request order for shared parenting in June 2025. Because there was no prior order allocating parental rights and responsibilities, the court issued an interim order designating parenting time pursuant to the court's standard parenting time schedule. Prior to trial, both parties filed proposed shared parenting plans and Father also filed a motion for custody of S.B. in the event that the parties could not agree on a shared parenting plan. All filings were considered by a magistrate who issued a decision that was adopted over Father's objections by the trial court on September 24, 2025. The trial court found that the parents were not amenable to a shared parenting plan and designated Mother as the residential parent and legal custodian of S.B.

{¶ 3} We briefly summarize the proceedings leading to this appeal.

{¶ 4} On the date of trial, Father appeared pro se and Mother appeared with counsel. The court noted that the guardian ad litem's ("GAL") report suggested that the parties would be able to negotiate a shared parenting plan, and so the trial court allocated the parties time to discuss a potential shared parenting plan. The matter ultimately proceeded to trial.

{¶ 5} Father stated during his case-in-chief that his preference is to share parenting with Mother. On cross-examination, Father indicated that he did not want Mother to move with S.B. back to Georgia, the child's birthplace, because Cuyahoga County "is where 95 percent of her family resides[.]" (Tr. 15.) Despite desiring shared parenting, Father indicated that he and Mother do not communicate

well regarding parenting. On cross-examination, Father was asked about a recent incident where he forfeited his weekend with S.B. because he went on a trip to Detroit, and he had not secured other childcare for S.B. When asked if Father believed it was in the child's best interest to be away from her Mother, he responded:

> I mean, hopefully we can come up to something, but if we can't, I think what's in the best interest of the child is to be around her family, I mean, given that she is a little girl as well I don't want to have to fight for custody because I believe a daughter, especially at that age, she'll be better with her mother, but her father is important as well.

(Tr. 28.) Father was also cross-examined about a recent incident where Mother had planned a birthday party at the Children's Museum for S.B. but had to cancel it because S.B. was in Father's care and he was unwilling to take her to the party and took her to Kalahari instead. Father's testimony about the incident was vague and evasive:

> [GAL]: But my question to you now is whether or not you told mom basically that she can't have her party because you won't bring [S.B.] to it?
>
> [FATHER]: I didn't tell mom she couldn't have her party.
>
> [GAL]: Did you tell mom that she wasn't gonna have [S.B.] during that time?
>
> [FATHER]: Well, given our standard parenting plan —
>
> [GAL]: It's a yes or a no question.
>
> [FATHER]: And also, my party that was planned —
>
> [THE COURT]: Sir, answer the question she asked.
>
> . . .
>
> [GAL]: Did you tell mom that you would not be coming to the party?

[FATHER]: Did I tell mom that I wouldn't be coming?

[GAL]: Yes.

[FATHER]: No.

[GAL]: You didn't decline the invitation even like the group email that I sent?

[FATHER]: Well, what was my words?

[GAL]: Okay.  Why did mom cancel her party, and please just be straight about it.

[FATHER]: You will have to ask mom.

[GAL]: I'm asking you because you're —

[FATHER]: I didn't plan the party.

[GAL]: What is your understanding of why she cancelled it?

[FATHER]: I don't know.  That's for you to ask mom.

[GAL]: You have no idea?

[FATHER]: No.

[GAL]: Is it possible it was because you declined her invitation and said that you had no intention of bringing [S.B.] to it?

[FATHER]: Anything is possible.

(Tr. 35-37.)  Father continued to be a difficult witness, and when asked if he had learned anything from the parenting class that the GAL had sent him and Mother to, he responded with "Nothing."  (Tr. 43.)

{¶ 6}  Mother testified.  She indicated that she had relocated to Cleveland for a one-year employment contract and had intended to move back to Atlanta, Georgia where S.B. was born.  The job offer letter was introduced as an exhibit.

According to her testimony, Father, who is from Cleveland, had moved to Atlanta to live with Mother and S.B., but eventually decided to move back to Cleveland, leaving Mother responsible for a mortgage and car payment as well as living expenses. About a month later, Mother received the job offer and rented an apartment in Cleveland that happened to be close to Father's residence. A copy of the lease was introduced as an exhibit and indicated that the lease was for 14 months, which she signed because it was a better deal than signing for 12 months. She stated that it was never her intention to remain in Cleveland and that she had kept her Atlanta home for this reason.

{¶ 7} Mother testified that the one-year employment contract was terminated early because "I went viral on TikTok and the Board of Directors just let me know they were not in movement with where we were taking the school and so I, along with someone else, was let go." (Tr. 60.) When asked about the TikTok incident, Mother explained that "[i]t was about my interactions with families regarding scholars that were sent to the office since some of the issues at the time in the school, the Board of Directors didn't like 'How young it was.'" (Tr. 61.) Since then, she worked as an independent contractor with Sherwin-Williams making their training deployment templates and did some freelance and charity work. She testified that she had recently received an offer for a job in Atlanta, but it was rescinded because Mother had to remain in Cleveland as a result of this custody case.

{¶ 8} When Mother was asked whether she believed it was in the child's best interest to stay in Cleveland, she disagreed. She felt that S.B. had better

opportunities in Atlanta where she "began modeling as a child for Carter's and Gerber[.]" (Tr. 64.) She also stated that in Atlanta, they have a beautiful backyard and nice community while their Cleveland home is "on the sixth floor of a building that was once low-income housing. Half of the time our water is off because they're doing repairs. The other half of the time there are bugs." (Tr. 64.)

{¶ 9} Contrary to Father's testimony, Mother testified that she had received no financial support from Father to take care of S.B. She elaborated that her sister, mother, and grandparents had helped her financially and that Father's father assisted for about two months. Mother believed that Father filed this action because she refused to "give him the funds from the home in Atlanta," because Father's money was used to purchase the home even though Mother is listed as the property's sole owner and mortgagee. (Tr. 72.) Mother also believed she had better financial potential outside of Cleveland because the job that she was offered in Atlanta was for $103,000 while her Cleveland job paid $80,000.

{¶ 10} Mother conceded that she was not against shared parenting but felt that she and Father could not adequately communicate regarding parenting because "it's all-around just very difficult trying to keep the equity in it all, trying to configure dates around his work schedule." (Tr. 72.)

{¶ 11} When asked whether S.B. had "derived benefits from living so closely to [F]ather," Mother initially disagreed but then clarified that "in the beginning," it was beneficial for S.B. who wanted to see her Father at certain times. (Tr. 55.) Mother felt that things changed when Father was upset with Mother and he

"stopped being as present." (Tr. 56.) Mother also testified as to how difficult Father is with attempts to pick up S.B. early, constantly wanting to know where she is because she is often with different members of Mother's family. Mother created a group text message in an attempt to make the process easier for Father, to which he responded that he wanted to be removed from the group message. Mother was unsure whether shared parenting was in S.B.'s best interests, stating that S.B. "really loves her dad and it's sometimes difficult having to pick up the pieces when she's expecting and she knows and I have to provide answers to her as to why, you know, dad is not getting you or why you can't go." (Tr. 88.)

{¶ 12} Father cross-examined Mother. Much of the cross-examination was duplicative of direct examination. Father's cross-examination revealed that Father had paid for several things relating to S.B., contrary to Mother's direct testimony. Father questioned Mother regarding losing her job, suggesting that it was because of a sexual relationship. Mother denied this and instead claimed it was because Father had posted inappropriate images and videos on Snapchat. Father also questioned Mother about the condition of her apartment in Cleveland, suggesting that it had been renovated and that all appliances, floors, and fixtures are new. Mother responded, "I'm not sure. They appear to be new, but I don't know if they were used before me." (Tr. 153.) The exchange was a tenuous back-and-forth that demonstrated the strained relationship between Father and Mother, as remarked by the GAL.

{¶ 13} On redirect examination, Mother admitted that while at first she felt that shared parenting could be achieved in this case, she no longer does. Because of this, she had recently filed for child support from Father.

{¶ 14} When the GAL finally testified, she opened by stating that "[i]n that report I did recommend shared parenting for this family. I would like to update my report, your Honor. I no longer feel that shared parenting is possible with this family." (Tr. 242.) She elaborated that after seeing Mother and Father "lock horns" after two days of trial, she no longer felt that they were capable of communicating in the best interest of the child and that the scales tipped slightly in Mother's favor. She cited the "birthday fiasco" as an example of the parent's dynamic and also referenced an instance where Mother sent extremely inappropriate texts to Father. The GAL felt that Mother was more open minded to the process while Father, though sometimes compliant, exhibited much more stubbornness. The GAL felt that Father's interfering with Mother's time with the child on her birthday was "petty" and that Mother seemed to consider the child's interests when making decisions, at least more frequently than Father. She stated, "I do have concerns that they're gonna make her a nervous wreck if they can't figure out how to be civilized and kind to one another and make things go smoothly for her." (Tr. 250.) Ultimately, the GAL concluded that both parents were suitable, cared for, and loved S.B., so an allocation of parenting time between both would be appropriate, but the plan remained dependent on whether Mother stayed in Cleveland or relocated to Atlanta where the child was born.

{¶ 15} Following closing arguments, the court took the matter under advisement and as indicated, designated Mother as the residential and custodial parent. Father appealed the trial court's decision and assigns the following errors for our review, verbatim:

> I. Court errored in fairness of interpreting the law for the best interest of the child and parental rights.
>
> II. Court errored using gender bias and not recognizing bias in GAL-A.B. report.
>
> III. Court errored in allowing emotional feelings to dictate case and views instead of law, logic and facts and no clear reason for decision granted.
>
> IV. Court errored in not taking in account history, previous parenting schedule agreements and submitted parenting plan proposals.
>
> V. Court errored in allowing perjury of I.M. which was proven in trial through testimony, questions, responses and presented exhibits.
>
> VI. Court errored in granting relocating approval causing more complications to the case.
>
> VII. Court errored in verdict to again favor I.M. in pending child support case.

{¶ 16} "'It is well established that pro se litigants are presumed to have knowledge of the law and legal procedures and that they are held to the same standard as litigants who are represented by counsel.'" *State ex rel. Fuller v. Mengel*, 2003-Ohio-6448, ¶ 10, quoting *Sabouri v. Ohio Dept. of Job & Family Servs.*, 145 Ohio App.3d 651, 654 (10th Dist .2001). Father's brief does not comply with App.R. 16(A)(3) that required Father to reference in the record where each error is reflected. He also has not separately argued each of his assigned errors with

reasons in support of the contentions with citations to the authorities, statutes, and parts of the record in violation of App.R. 16(A)(7). And Father's final assignment of error references child support, which was not determined in the order that Father appealed from. Pursuant to App.R. 12, we are permitted to disregard all of Father's assigned errors.

{¶ 17} We are, however, mindful that cases are best resolved on their merits, especially family matters that concern fundamental parental rights. Moreover, Father took the time to file this appeal and appear for oral argument. Though Mother did not file a responsive brief, she also appeared for oral argument. Accordingly, we elect to address Father's first and sixth assigned errors that contest the trial court's decision determining that shared parenting was not in the best interest of the child and designating Mother as the residential parent and legal custodian.

{¶ 18} "'It has long been a recognized rule of law that for a reviewing court to overturn a trial court's determination of custody, the appellate court must find that the trial court abused its discretion.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 12, quoting *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994) (distinguishing the R.C. 3109.04 standard of review from the standard of review under R.C. 2151.414). "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). This is because "[t]he knowledge a trial court gains through

observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Id.*, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13 (1952).

{¶ 19} R.C. 3109.04 establishes the process for allocating parental rights and responsibilities. When allocating parental rights and responsibilities, the trial court is required to "take into account that which would be in the best interest of the child[.]" R.C. 3109.04(B)(1). Relevant herein,

> if at least one parent files both a pleading or motion and a shared parenting plan under [subsection (G)] but no plan for shared parenting is in the best interest of the children, the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and legal custodian of the child, and divide between the parents the other rights responsibilities for the care of the children[.]

R.C. 3109.04(A)(1). In making a custody determination, subsection (F)(1) provides a nonexhaustive list of factors that the court shall consider in determining the best interests of the child. In determining whether a shared parenting plan is in the best interest of the children, subsection (F)(2) requires the court to consider all factors in (F)(1) and includes five more factors to consider. Here, the trial court's judgment indicated that it considered all relevant factors. But Father has not specifically contested any of these factors or presented arguments relating to these factors, nor has he demonstrated how the court's decision constituted an abuse of discretion.

{¶ 20} The testimony received as summarized above indicates that both Father and Mother felt that a shared parenting plan would be in the child's best

interest, but could not come to an agreement regarding shared parenting and were unable to set aside their ill will for the sake of the child. Mother and Father demonstrated their inability to communicate with each other even when their communication concerns parenting S.B. Since the parents could not communicate effectively, they used an app called OurFamilyWizard to communicate with each other to make custodial arrangements. Many of the primary issues in this case concerned disputes that occurred while attempting to co-parent the child, and several of the cited disputes only related to Father and Mother and were unrelated to parenting the child. It is also telling that the trial judge had to constantly remind all parties that the child and her best interests were the subject of this hearing, because both parties were disparaging and accusatory towards the other.

{¶ 21} Based on their inability to handle shared parenting during the pendency of this action, it is unlikely that this situation would improve if a shared parenting agreement was implemented. The GAL made strong points about the parents prioritizing their personal issues over their child. The GAL even noted that when both parents are around and getting along, S.B. is happy. For this reason, the GAL had initially recommended shared parenting but changed her mind after observing the parties interact at trial.

{¶ 22} It is clear from the record that both parents are suitable, loving, involved, and care deeply for S.B. It is also clear that shared parenting was difficult for the parents because they cannot communicate with each other in a consistently respectful manner and because deviations from the shared parenting agreement

could not be resolved. Accordingly, we cannot say that the trial court abused its discretion in selecting Mother as the residential parent and legal custodian.

{¶ 23} Father's first and sixth assignments of error are overruled. All other assignments of error are disregarded for noncompliance with App.R. 12(A)(2) and (16)(A).

{¶ 24} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR